JOURNAL ENTRY AND OPINION
{¶ 1} Appellant, Guillermo Torres, appeals from a June 8, 2006 judgment of the Cuyahoga County Court of Common Pleas, finding him guilty of murder with a firearm specification and sentencing him to eighteen years to life in prison.
 {¶ 2} On September 22, 2005, Torres was indicted by the Cuyahoga County Grand Jury on one count of aggravated murder, in violation of R.C. 2903.01(A), with a mandatory three-year firearm specification. Torres entered a plea of not guilty to the charge.
 {¶ 3} Prior to trial, Torres filed two motions to suppress, moving the court to suppress eyewitness identifications and oral statements that he allegedly made. The trial court held a hearing on both motions on April 18, 2006, and denied them the same day. The following testimony was presented at the hearing. *Page 3 
 {¶ 4} The state first presented Officer Leroy Brinkhoff ("Officer Brinkhoff"). Officer Brinkhoff testified that he was on duty on September 5, 2005 with his partner, Dona Feador ("Officer Feador"). They received a radio call that there was a female victim with a gunshot wound at 1976 West 48th Street. The victim was Candy Vorhees.
 {¶ 5} Vorhees' father, Harold Ford, gave Officer Brinkhoff a description of the suspect. Ford described the suspect as a "[h]ispanic male, possibly in his 50's, heavyset with a white T shirt[.]"
 {¶ 6} A short time later, they received a call that the suspect may have been at the corner of West 45th Street and Lorain, near a market. Officer Brinkhoff drove there with Officer Sean Graham ("Officer Graham") and began searching for the suspect on foot.[1] Officer Brinkhoff walked north on West 45th, and saw "the defendant sitting on the front porch drinking a beer." He said that he approached the man because he matched the physical description given by the witnesses.
 {¶ 7} Officer Brinkhoff drew his gun and approached the suspect. As he approached him, the man said that he had been robbed and told him, "[y]ou should see the condition of it, it's a mess in there." Officer Brinkhoff stated, "I thought at this point he was the victim of a burglary and may not have been who we were looking for but [he] fit [the] physical characteristics." *Page 4 
 {¶ 8} Officer Brinkhoff thought the suspect was "a close enough match to warrant a cold stand, to have the witnesses look and see if this is the guy who had shot Candy." So, Officers Brinkhoff and Graham placed the suspect in the back of the zone car, without arresting him or handcuffing him, and drove him "less than half a mile" to the scene of the crime. The suspect went voluntarily. Officer Brinkhoff did not know how long it had been from the time he initially arrived at the scene to the time of the cold stand. When the officers pulled the suspect out of the car, Ford and others immediately said, "[y]es, that's him." Officer Brinkhoff then identified Torres in court.
 {¶ 9} On cross-examination, Officer Brinkhoff explained that Ford had told the officers that the suspect arrived at the scene in a gray van with two other Hispanic people. Ford told Officer Brinkhoff that the shooter exited the van, stood in the driveway and shot Vorhees, and then got back into the van and fled.
 {¶ 10} Officer Brinkhoff denied holding a pistol on Torres when they got him out of the car for the cold stand. Although, he agreed that he may have held onto Torres' arm. When they got Torres out of the car, Officer Brinkhoff stated that the witnesses were thirty to forty feet away. He also said that Torres was wearing a white tank top and khaki shorts.
 {¶ 11} On redirect-examination, Officer Brinkhoff testified that he believed the witnesses were positive in their identification because of their demeanor. The witnesses did not hesitate when they said, "[y]es, that's him," and they "were absolutely 100% with their convictions." *Page 5 
 {¶ 12} Officer Feador testified next. She was the writing officer on September 5, 2005, and confirmed that she wrote the report about the incident. She referred to it throughout her testimony.
 {¶ 13} She indicated that she and Officer Brinkhoff received the call at 1:39 p.m. She said that she had seen Vorhees ten to fifteen minutes before she was shot. Vorhees had been walking on Lorain Avenue, near West 44th and she appeared to be intoxicated. They stopped the police cruiser and talked to her. She had numerous compact discs in her hand, which she dropped all over the street.
 {¶ 14} When they arrived at the scene, Officer Feador testified that they talked to three witnesses, Ford, Frank Camarda, and Jason Neal.[2] Camarda gave them a description of the suspect, indicating the man was "short, bald, wearing a white T shirt." The description that she put over the police radio was: "Hispanic male, balding, wearing a white T shirt and cargo pants."
 {¶ 15} Officer Feador said that when Officers Brinkhoff and Graham brought a man to the scene, whom she identified in court as Torres, she did not think he was handcuffed when they got him out of the car because she put handcuffs on him later. Officers Brinkhoff and Graham were parked two houses from 1976 West 48th Street when they got Torres out of the zone car. She confirmed that several witnesses said, "[t]hat's him," without any hesitation. She also said that the cold stand took *Page 6 
place "[m]ost definitely" under an hour of initially arriving at the scene and she recalled that Ford and Camarda definitely identified Torres at the scene.
 {¶ 16} The officers then placed Torres under arrest. Officer Feador handcuffed him and read him his Miranda rights. Officer Feador stated that "[t]here was definitely a language barrier," so she called Officer Marisol Gonzalez ("Officer Gonzalez") to read him his rights in Spanish.
 {¶ 17} However, before Officer Gonzalez read him his rights in Spanish, Officer Feador stated that Torres told her that he understood his rights and that, "he did not need to talk to anyone." She then advised him that he did not have to make any statements to her, but that other officers would talk to him later. He replied that, "he did not need to make a statement, that he was a man." Torres then said, "I was robbed and I got one. You're letting another one get away. You don't care." At that point, Officer Feador advised him of his rights again in English. Officer Gonzalez then arrived and advised Torres of his rights in Spanish.
 {¶ 18} Officer Feador said that they took Torres to the central booking area. While she was waiting with him for the homicide unit to come, he said to her, "[m]aybe I took a bad name off the streets." She stated that she was not interrogating him at the time, nor was she asking him anything about the crime.
 {¶ 19} On cross-examination, she said that the witnesses identified Torres from two houses away. She agreed that it was more than thirty feet, but could not estimate how far it was. *Page 7 
 {¶ 20} On redirect examination, she stated that Torres could speak English and that his statements were in English. She was satisfied that he could speak English because when she told him he could not smoke, he understood her and he gave her his ID when she asked him for it in English.
 {¶ 21} The state then presented Officer Gonzalez. She was raised in Puerto Rico until she was sixteen. She said that after she read Torres his rights in Spanish, she asked him if there was anything he wanted to tell the officers, and he said "not really." She then explained how Torres began talking to her in Spanish about some kids who got robbed and that somebody broke into their home.[3] She did get the impression that Torres understood English, because he spoke to her in Spanish and English.
 {¶ 22} The next witness to testify was Ford. Vorhees lived with him prior to her death at 1976 West 48th Street, Cleveland, Ohio. At the time of the shooting, he was in his front yard working on his lawn mower. Vorhees was sitting on the front porch steps, next to Camarda. "Poo's brother" was standing in the doorway using the telephone and "Rico" was sitting on the upstairs porch.[4]
 {¶ 23} Ford testified that he saw a gray van pull up to the house with three guys in it. He was not really paying attention, until the man in the front passenger *Page 8 
seat got out of the van and said, "I told you to stay away from us." Ford looked up and asked him, "Who you talking to?" The man then started shooting.
 {¶ 24} When Ford realized the man was trying to shoot Vorhees, he told him, "[t]hat's my daughter." Ford then stated, "I went to grab a hammer and the next thing you know he pointed the gun at me and it went click and I just hit the ground." He said the whole incident lasted less than a minute and that he did not look at the man the entire time, because he "watch[ed] the gun mostly." But, he said that he did get "a fairly decent look at him. You never forget the guy that just pulled the trigger on you." Ford then identified Torres in court.
 {¶ 25} Ford further testified that when the police brought Torres back to the scene, that he and Camarda identified him as the shooter immediately. He did not notice if he was dressed the same, but he said that he recognized his face. Ford also testified that he thought he had seen Torres previously at Rico's Market, sitting on a paper box.
 {¶ 26} On cross-examination, Ford stated that when the police brought Torres back to the scene, they parked two houses away, at 1970 West 45th Street. He said that Torres was not handcuffed, nor did the police have a pistol on him. He denied ever seeing Torres before the shooting, but then reaffirmed that he may have seen him at Rico's Market one time.
 {¶ 27} Camarda testified after Ford. He stated that he was sitting on the front porch steps beside Vorhees, when a gray van pulled up to the house. A man got out of the passenger front door and started shooting. In court, he described the man as *Page 9 
being "bald, had a little mustache, kind of heavyset, maybe 200 pounds, maybe about five-eight, five-seven, somewhere in there." He then said that the man had on a "T shirt, tank top T shirt, white and I think tan pants" that were "[a]bout knee length." He then identified Torres in court. When he heard the shots, he said that he took off running and hid in the bushes two houses down.
 {¶ 28} Camarda stated that when the police brought Torres back, they parked two houses down and Torres was in the back seat of the police car. He said, "[t]hey opened the door and he came out, stepped out." He could not remember if Torres was handcuffed. The police asked Camarda, "if this was the man that did the shooting," and he replied that it was. It was approximately twenty minutes after the shooting.
 {¶ 29} On cross-examination, Camarda admitted that he was only able to see Torres for "[s]econds" before he took off running.
 {¶ 30} Next to testify for the state was Lett. He said that he had been living with Ford when Vorhees was shot. He was sitting on the upstairs porch when a gray van pulled up to the curb. Lett saw Torres, whom he identified in court, get out of the van with a pistol and start shooting. However, after the first shot, Lett stated that he went into the house and hid. He heard "about three" shots fired. He saw the police bring Torres back to the scene, but he remained on his porch and the police did not talk to him at that point.[5] *Page 10 
 {¶ 31} On cross-examination, Lett stated that he gave a description of the shooter to the police "a couple of days after it happened." Lett first stated that he had good vision. He then said that he needed glasses to read. Then, he said that he sees "better up close" and needs glasses to see far away. He admitted that things in the distance are blurry and when he saw the shooter get out of the van, that it was blurry.
 {¶ 32} Torres did not present any witnesses on his behalf.
 {¶ 33} At the close of the suppression hearing, the trial court stated:
 {¶ 34} "With regard to the ID, although Mr. Lett's testimony is somewhat less than convincing, I do have the testimony of Mr. Frank Camarda and Harold Ford, both of whom said there was no prompting of any kind by the police, the defendant was not shackled when he was removed from the car upon return to the crime scene and the Court will allow the testimony and will not grant the suppression motion."
 {¶ 35} Regarding the second suppression issue, the oral statements, the trial court stated:
 {¶ 36} "[T]he defense really hinges it on whether or not Mr. Torres understood his Miranda rights and I've heard testimony from Officer Gonzalez that the defendant, her perception, being bilingual, had an understanding of basic English, although he did not have a very — I think she used the word `sophisticated manner of expressing himself.' *Page 11 
 {¶ 37} "And I've also known from the testimony of Officer Feador that she did Mirandized [sic] in English twice before the Spanish Mirandization took place, so the Court will deny the motion as to suppression."
 {¶ 38} A jury trial commenced the following day. The same witnesses who testified in the suppression hearing also testified at trial. Essentially, their testimony provided the same information, except for the following.
 {¶ 39} Ford testified that the police took him and Camarda to the parking lot of "Rico's store," that same day to identify the gray van, which they did.
 {¶ 40} On cross-examination, Officer Brinkhoff agreed that the description given to him on the day of the shooting matched a lot of Hispanic males living in that area. He admitted that Torres did not try to run away as he approached him on the porch, that Torres just sat there drinking a beer by himself, and he did not find any weapons on Torres when he patted him down.
 {¶ 41} Officer Feador indicated on cross-examination that neither Camarda, nor Ford, appeared intoxicated. She agreed that no one said the suspect had tattoos on him when describing him and that she did not remember him having tattoos when she arrested him and booked him.
 {¶ 42} Officer Gonzalez stated after Torres was taken to the station, she helped find the suspect van, which was found at Rico's Market. She said that Louis Torres, the defendant's brother, owns Rico's Market and the gray van. *Page 12 
 {¶ 43} Camarda identified photographs taken at the scene. In one of the pictures, he identified a white bag that Vorhees had brought back to the house with her, but said that he never saw what was in the white bag. He stated that Vorhees had only been home for approximately five minutes before she was shot.
 {¶ 44} On cross-examination, Camarda admitted that he had problems with his vision.[6] He stated that he needs glasses and agreed that he has problems seeing things in the distance. He said that he was only ten to fifteen feet away from Torres when he got out of the van. When he identified Torres in the cold stand, he said that he was standing by the police tape, which was only about eight feet from Torres.
 {¶ 45} Officer Graham testified that after receiving a radio call that the suspect vehicle was located in a parking lot at 45th and Lorain, he went there with Officer Brinkhoff. He said that Officer Brinkhoff began walking north on West 45th Street and he followed him in the police cruiser.
 {¶ 46} They saw a man who fit the physical description of the suspect, whom Officer Graham identified in court as Torres, and they approached him. When they took Torres back to the scene for the cold stand, he explained that the witnesses who identified Torres were approximately thirty-five to forty feet away. Officer Graham also said that the cold stand occurred about thirty to thirty-five minutes after they had initially arrived at the scene. After the witnesses identified Torres in the cold stand, Officer Graham received orders to go back to the West 45th Street location to secure the scene of a burglary. *Page 13 
 {¶ 47} Matilde Rodriguez also testified for the state.[7] He stated that he lived at 1957 West 45th Street (the house where Torres was found on the porch) with some friends. He was at home on September 5, 2005, and he said that his brother, Obispo Rodriguez, "went to the store and found a girl and one guy and he was robbed. They told him, I'm going to kill you, give us $20." Obispo gave them twenty dollars and left, but they followed him to Matilde's house. The girl told Obispo, "I want to have sex with you," but Obispo told her no.
 {¶ 48} Matilde stated that the man and the woman would not leave until he gave them another twenty dollars. They left then, but they returned immediately and knocked very loudly on the door. Matilde and Obispo went to Matilde's bedroom and locked the door. The man and woman broke a window and came in the house. So, Matilde and his brother broke the bedroom window and went to Rico's Market. He identified a Play Station and games that the girl and the guy stole out of his home.
 {¶ 49} On cross-examination, Matilde stated that when he went back to his house, he saw that the man and woman took some CDs and some video games. Martel, who also lived with Matilde, was there with the "fat man," whom he identified in court as Torres. He said that the fat man had a gun in his hand.
 {¶ 50} On redirect-examination, he stated that three guys came back from Rico's Market with him to help him, including Martel, a man with a hat, and the fat guy. *Page 14 
 {¶ 51} Obispo corroborated his brother's testimony. In addition, he stated that when they walked back to Matilde's house from Rico's Market, the "fat man" was with them, as well as the other guy who lived with his brother (although not completely clear, other testimony shows this was probably Martel) and a man with a backwards hat. He said the three men got into a fight with the woman and man when they came out of the house. The woman and man left and three men got into a van and left. They came back about five minutes later and the fat man said, "that he gave a shot at the girl." Obispo also testified that the fat man said, "[t]he police is going to come for me." He then identified Torres in court as the fat man.
 {¶ 52} Marvin L. Simmons testified that he lives across the street from Ford. He was sitting next to Vorhees on the front porch after she came back to the house. He stood up to go in the house to use the phone, and as he stood up, he saw what looked like a beige color van slowing down at the house. As he got to the second stair, he heard a gunshot, and he ran into the house to call 9-1-1. He also heard a male voice say something in Spanish. He said that Vorhees had not been back for more than three minutes before she was shot.
 {¶ 53} Dr. Andrea McCollom, Cuyahoga County Coroner, testified that she performed the autopsy on Vorhees, who was pronounced dead at 2:47 p.m. on September 5, 2005. Vorhees had one entrance gunshot wound on her right neck, above her clavicle. The bullet exited the right pleural cavity, fracturing her seventh rib. *Page 15 
 {¶ 54} Curtis Jones, supervisor of the trace evidence department for the Cuyahoga County Coroner, testified that there was no gunshot primer residue on Torres' right or left hand. He stated that gunshot residue does not adhere very well to surfaces, so it could have been removed by hand washing, rubbing of hands, or putting hands in a pocket numerous times.
 {¶ 55} Bruce Taylor, a detective in the crime scene unit, stated that he examined the gray van that was taken into police custody. He did not find fingerprints or anything of evidentiary value in the van.
 {¶ 56} James Ealey, a forensic ballistic examiner for the city of Cleveland Police Department, testified that one nine millimeter shell casing was found at the scene, as well as two spent nine millimeter bullets.
 {¶ 57} Lett testified after Ealey. His testimony was similar to his previous suppression hearing testimony. He identified Torres in court as the man who got out of the van and started shooting.
 {¶ 58} On cross-examination, Lett stated that he only had trouble seeing things up close.[8] He agreed that he gave a statement to police on March 1, 2006, almost six months after the incident occurred. In his statement, he said that the van was white and the shooter had a revolver, not a semi-automatic gun. *Page 16 
 {¶ 59} Nicole Jennings, a detective who works in the crime scene and records unit, testified that she only collected one shell casing, which was on the tree lawn.[9] She identified a photograph of a shell casing found at the scene. It was found in the grass and had a yellow placard with the number "one" beside it. On cross-examination, she agreed that there was no photograph showing the relationship of placard number "one" to the other placards.
 {¶ 60} Neal testified after Jennings.[10] He testified that he was with Vorhees on the morning of September 5, 2005 and had been with her all night. They did not sleep that night. They had been hanging out, drinking, and smoking crack cocaine. He stated that they left the house around 5:00 a.m. to go "walking around." He said Vorhees "was prostituting while I was just walking around going to her house and back and forth to my house on 47th."
 {¶ 61} Sometime around 10:00 or 11:00 a.m., a man who was "short and a little bit husky" and he was "like Mexican or something" asked Vorhees for "a blow job." Vorhees "took him in the back of a place on 45th Street and took his money and then he just left and went back to his house." He said that Vorhees did not have sex with the man, but that she took his money. They followed the man because Vorhees wanted "to get some more money." *Page 17 
 {¶ 62} At this time, Neal stated that Vorhees was "very tipsy, like stumbling everywhere * * * [and] didn't really have a grip on reality." Neal said that they just walked into the man's house and he was sitting on the couch. There were also two other men in the house. Vorhees took twenty more dollars from the man, and they left. They walked five feet up the street and turned around and went back. Vorhees tried to open the door, but it would not open, so she knocked very loudly and kicked the door. Then, they walked around to the back of the house. Neal said that he took a brick and broke the window on the back door. Vorhees crawled through it and opened the door. The three men who were in the house "fled out the side window."
 {¶ 63} Once they were in the house, Neal said that they searched for anything that was of value. They found a Play Station and a couple of games and put them in a bag and left. He then identified the items in court as the ones they took from the house. Neal said that he and Vorhees also "busted stereos and just messed" the house up before they left.
 {¶ 64} Neal testified that he looked out the door before they left and saw four men running down the street toward the house. He said that he had seen one of the men in the house earlier. He walked out of the house to stop them, but couldn't. Vorhees then came out of the house with a knife and was waving it at them. She was also tripping and falling everywhere. The men tried to hit her with a fifteen-foot pole, but she just walked away from them. The men did not follow.
 {¶ 65} They walked back to Vorhees' house and she sent him to get cigarettes. Soon after he left, he heard three noises, which he later figured out were *Page 18 
gunshots. He then saw a van with a blueish tint to it driving down the road and a man hanging out the window of the van. Neal did not remember what he looked like, but after the prosecutor showed him his written statement that was given on the day of the incident, he recalled that he gave the police a description of the man; i.e., that he had a mustache, was bald, had a white tee shirt on, and had "sort of a beard."
 {¶ 66} On cross-examination, Neal read his written statement in court, which was: "Passenger in the van was a fat Mexican wearing a white T shirt, he had short hair, I never saw him before." When asked which was true, his testimony in court that Torres was bald, or his written statement that Torres had short hair, Neal said, "[t]oday's testimony, I guess." Neal admitted that he did not really get a good look at Torres when he was in the van, and also agreed that meant that he could not give a very good description of him. He further admitted that he was "feeling the effects of alcohol" that day and that was part of the reason he could not get a "good look at who was in the van."
 {¶ 67} Joselito Sandoval ("Detective Sandoval"), a detective assigned to the homicide unit, testified that on September 5, 2005, he went to the house at 1957 West 45th Street to investigate a burglary. Other officers were already on the scene and had Matilde Rodriguez in the back of a zone car. He observed a broken window in the rear door of the house, as well as one in the northeast bedroom.
 {¶ 68} The state's final witness was Harry Matlock ("Detective Matlock"), a detective in the homicide unit. He took measurements at 1976 West 48th Street. He identified a "spent shell casing" that was recovered from the scene. He stated that it *Page 19 
was found thirty-five inches from the curb on the west side of West 48th Street. Detective Matlock reported the shell casing was found ten feet, ten inches from where witnesses said the shooter was standing when he fired the gun. He agreed there was no picture of placard number one in relation to the other placards, which was where the shell casing was found.
 {¶ 69} Detective Matlock stated that at the time he found the casing, he was not sure if it was part of the case. When asked, "[w]hat is your opinion now?" He replied, "[a]t this point I personally don't believe that it's part of the case." When asked why, he stated "[b]ecause of the condition of the casing itself, it's very deteriorated." He said that if there had been three shots fired from a semi-automatic gun, he would have expected to find three shell casings, but no other casings were found.
 {¶ 70} He testified that the distance between Vorhees and the shooter was twelve feet. The bag that Vorhees brought with her when she returned to the home, which contained the Play Station, games, and CDs, was found four feet, four inches from where Vorhees was sitting.
 {¶ 71} At the close of the state's case, Torres made a motion pursuant to Crim.R. 29, which the trial court denied. The jury returned a guilty verdict to the lesser included offense of murder, in violation of R.C.2903.02, with the mandatory three-year firearm arm specification.
 {¶ 72} On June 8, 2006, the trial court sentenced Torres to fifteen years to life in prison for murder and three years for the mandatory firearm specification, to be *Page 20 
served prior to and consecutive to the murder sentence, for an aggregate sentence of eighteen years to life. In addition, the trial court informed Torres that he would have five years of mandatory post-release control after he was released from prison.
 {¶ 73} It is from this judgment which Torres appeals, raising the following three assignments of error:
 {¶ 74} "[1.] The trial court erred, in violation of defendant's rights to due process of law, under the Fourteenth Amendment of the United States Constitution and Article I, Section 16 of the Ohio Constitution, in denying defendant's motion to suppress the eyewitness identification of Harold Ford, Frank Camarda, and David Lett.
 {¶ 75} "[2.] The trial court erred, in violation of defendant's rights against self-incrimination, under the Fourteenth Amendment of the United States Constitution and Article I, Section 10 of the Ohio Constitution, in denying defendant's motion to suppress statements.
 {¶ 76} "[3.] The verdict was against the manifest weight of the evidence, in violation of the defendant's right to due process of law under the Fourteenth Amendment of the United States Constitution and Article I, Section 16 of the Ohio Constitution."
 {¶ 77} In his first assignment of error, Torres maintains that the "critical problem in this case is that the identification resulted from a cold stand[,]" which was *Page 21 
inherently suggestive. Thus, he argues that the trial court erred when it did not grant his motion to suppress the eyewitnesses' identification of him.[11]
 {¶ 78} In State v. Freeman, 8th Dist. No. 85137, 2005-Ohio-3480, at _18, reversed on other grounds, quoting State v. Curry (1994),95 Ohio App.3d 93, 96, this court set forth the standard of review on a motion to suppress:
 {¶ 79} "`In a motion to suppress, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and evaluate witness credibility. State v. Clay (1973),34 Ohio St.2d 250 * * *. A reviewing court is bound to accept those findings of fact if supported by competent, credible evidence. See State v. Schiebel (1990),55 Ohio St.3d 71 * * *. However, without deference to the trial court's conclusion, it must be determined independently whether, as a matter of law, the facts meet the appropriate legal standard. State v.Claytor (1993), 85 Ohio App.3d 623, 627 * * *.'" (Parallel citations omitted.)
 {¶ 80} Appellate courts apply a two-prong test in determining the admissibility of challenged identification testimony. Freeman at _19. First, the defendant bears the burden of demonstrating that the identification procedure was unnecessarily suggestive. Id. If this burden is met, the court must consider whether the procedure was so unduly suggestive as to give rise to irreparable mistaken identification. Id., citing State v. Page, 8th Dist. No. 84341,2005-Ohio-1493. "Stated differently, the, *Page 22 
issue is whether the identification, viewed under the totality of the circumstances, is reliable despite the suggestive procedure." State v.Willis (1997), 120 Ohio App. 3d 320, 324-25, citing Manson v.Brathwaite (1977), 432 U.S. 98, 114.
 {¶ 81} In a "cold stand," witnesses, in a relatively short time after the incident, are shown only one person and are asked whether they can identify the perpetrator of the crime. Freeman at _20. "A `cold stand' or one-on-one show up identification may be suggestive under certain circumstances; however, it is impermissible only where there is substantial likelihood of misidentification." State v. Batey (Sept.2, 1999), 8th Dist. No. 74764, 1999 Ohio App. LEXIS 4086, at 12.
 {¶ 82} In State v. Madison (1980), 64 Ohio St.2d 322, 332, the Supreme Court of Ohio explained:
 {¶ 83} "`There is no prohibition against a viewing of a suspect alone in what is called a `one-man showup' when this occurs near the time of the alleged criminal act; such a course does not tend to bring about misidentification but rather tends under some circumstances to insure accuracy. (* * *)
 {¶ 84} "`(* * *) (P)olice action in returning the suspect to the vicinity of the crime for immediate identification in circumstances such as these fosters the desirable objectives of fresh, accurate identification which in some instances may lead to the immediate release of an innocent suspect and at the same time enable the police to resume the search for the fleeing culprit while the trail is fresh. * * *'"
 {¶ 85} This court has previously explained the conditions necessary for a proper "cold stand" identification. A cold stand or one-on-one show-up identification *Page 23 
is permissible as long as the trial court considers the following factors: "(1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness; and (5) the length of the time between the crime and the confrontation." State v.Thompson, 8th Dist. No. 79938, 2002-Ohio-2390, citing Neil v.Biggers (1972), 409 U.S. 188.
 {¶ 86} Turning to these five factors, we apply them to the two witnesses who identified Torres in the cold stand, Ford and Camarda:
 {¶ 87} The opportunity to view. Although witnesses testified that the whole incident took place in less than a minute, Ford was within a few feet of the shooter, in the front yard, when the shooter got out of the van. Ford looked at the shooter when he said, "I told you to stay away from us." Ford asked him, "Who you talking to?" Ford did not run away when the man started shooting, but saw that the man was aiming at his daughter. Ford testified that he told him, "[t]hat's my daughter. He then testified that he went to grab a hammer, but that the shooter pointed the gun at him and pulled the trigger, and that he just "hit the ground" at that point. Thus, although it was a short amount of time, Ford testified that he did get "a fairly decent look at him. You never forget the guy that just pulled the trigger on you." Ford also stated that he thought he had seen Torres previously at Rico's Market.
 {¶ 88} Camarda testified that he was on the front porch when the van pulled up and within fifteen to twenty feet from the shooter when he got out of the van. When Camarda saw the man get out of the passenger side of the van and start shooting, *Page 24 
he took off running. He admitted on cross-examination that he was only able to view the shooter for "[s]econds" before he took off running.
 {¶ 89} Camarda admitted at trial that he had trouble seeing distances. However, Camarda was only twelve feet away from the shooter when he fired his first shot.[12] When he identified him, he said he stood near the police tape, which was approximately eight feet away from the shooter.
 {¶ 90} 2. The degree of attention. According to Ford's testimony, Ford not only had the best opportunity to view the suspect, but also had the highest degree of attention. He did not run a couple of houses away as Camarda did. In fact, he went to grab a hammer when he saw the shooter was aiming for his daughter. Ford said that he was standing within a few feet of the shooter when the shooter pointed the gun at him and pulled the trigger.
 {¶ 91} 3. The accuracy of the description. Ford and Camarda both gave a physical description of Torres. Although not identical, both descriptions were fairly accurate. Ford told Officer Brinkoff that the suspect was a "Hispanic male, possibly in his 50's, heavyset with a white T shirt[.]" Camarda described the suspect as a short male, bald, and wearing a white tee shirt. The description that was put over the police radio was: "Hispanic male, balding, wearing a white T shirt and cargo pants." Torres is Hispanic, balding on top, is in his late forties and had a white tank top on and khaki cargo shorts when he was found by Officer Brinkhoff and Graham. *Page 25 
 {¶ 92} 4. The witness' level of certainty. Police officers testified that the witnesses did not hesitate when they positively identified Torres in the cold stand. Officer Brinkhoff said that the witnesses "were absolutely 100% with their convictions" that Torres was the shooter. Officer Feador testified that the witnesses said, "That's him" without any hesitation. When asked if it took him any time to identify Torres in the cold stand, Ford replied, "[h]ell no. As soon as they brought him out of the car." Ford also stated on cross-examination that "as soon as we seen him, we knew it was him."
 {¶ 93} 5. The time between the crime and the confrontation. Officer Brinkhoff could not remember exactly how long it was before the cold stand, but believed it was within the hour of the shooting. Officer Feador testified that she could not remember exactly how long it was before the cold stand took place after the shooting, but that it was "[m]ost definitely" under an hour. Camarda said that the identification took place twenty minutes after the shooting. Officer Graham testified that the cold stand took place approximately thirty to thirty-five minutes after the police initially arrived at the scene.
 {¶ 94} After reviewing the totality of the relevant testimony and applying it to the case at bar, we conclude that the trial court did not err when it denied Torres' motion to suppress. The trial court found Camarda's and Ford's testimony to be reliable. The trial court stated that the police did not prompt them in any way, nor was the defendant shackled when the police brought him back to the scene. We agree. In addition, the police were not holding a gun on him at the scene. *Page 26 
 {¶ 95} Furthermore, both witnesses accurately described Torres. Officers Brinkhoff and Feador testified that they identified him immediately, without hesitation. Although not exactly clear, the time between the shooting and the cold stand was most likely under one hour. Both witnesses had a sufficient opportunity to view the shooter and Ford had an ample degree of attention.
 {¶ 96} We agree that Camarda's degree of attention is somewhat lacking. However, based on our analysis reviewing all five factors in their totality, we conclude that the identification was reliable, despite the inherently suggestive nature of a cold stand. SeeBatey, supra. Thus, the trial court did not err when it denied Torres' motion to suppress. As such, Torres' first assignment of error is without merit.
 {¶ 97} In his second assignment of error, Torres argues that the trial court erred when it did not suppress statements made by him after the police read him his Miranda rights. Specifically, Torres contends that two statements he made to Officer Feador should have been suppressed since he made them after he invoked his right to remain silent when he informed her that "he did not need to talk to anyone."
 {¶ 98} The Fifth Amendment of the United States Constitution provides persons with a privilege against compelled self-incrimination. "[W]hen an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege[.]"Miranda v. Arizona (1966), 384 U.S. 436, 478-479. The *Page 27 
suspect must be advised prior to any questioning that he has the right to remain silent; that anything he says can be used against him in a court of law; that he has the right to the presence of an attorney; and that if he cannot afford an attorney, one will be appointed for him prior to any questioning if he so desires. Id. at 479.
 {¶ 99} "Miranda provides that the prosecution may not admit statements from the defendant that are obtained through custodial interrogation unless the defendant has been fully advised of his rights. Custodial interrogation is defined as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in any significant way." State v. Durden (Feb. 10, 1994), 8th Dist. No. 64693, 1994 Ohio App. LEXIS 447, citingMiranda, supra.
 {¶ 100} However, the Miranda rule against self-incrimination does not apply to voluntary statements. State v. Loyer, 8th Dist. No. 87995,2007-Ohio-716, at _16, citing State v. Phillips (1991),75 Ohio App.3d 785. "Voluntary statements by a defendant to the police are considered admissible in court because `Miranda protects defendants against government coercion leading them to surrender rights protected by theFifth Amendment; it goes no further than that.'" Id., citingColorado v. Connelly (1986), 479 U.S. 157, 170.
 {¶ 101} In the case at hand, there is no question that Torres was in custody when he made the statements. He had already been arrested and Officer Feador had read him his rights in English the first time when Torres stated, "I was robbed and I got one. You're letting another one get away. You don't care." Officer Feador then read him his rights in English again, and then Officer Gonzalez read him *Page 28 
his rights in Spanish. Torres made his second statement in the holding room at the booking station. Officer Feador testified that while she was sitting with Torres waiting for homicide detectives to arrive, Torres stated, "[m]aybe I took a bad name off the streets."
 {¶ 102} During both occasions, Officer Feador testified that she was not interrogating Torres when he made his statements; i.e., she did not initiate questioning. When Torres made his first statement, Officer Feador had informed him that he did not have to make any statements to her, but that he would have to follow up with homicide detectives. To that, he replied, "he did not need to make a statement, that he was a man." Subsequently, he made the incriminating statement, "I was robbed and I got one. You're letting another get away. You don't care." When Torres made his second incriminating statement at the booking station, Officer Feador testified that she was not interrogating him at the time, nor had she asked him anything about the crime.
 {¶ 103} In addition, Officer Feador and Officer Gonzalez both testified that they believed Torres could understand English. Indeed, Torres even stated that he understood his rights when Officer FeadorMirandized him in English the first time. Officer Feador explained that he was complaining in English that he wanted a cigarette. Officer Gonzalez believed that Torres understood English because he spoke English and Spanish to her.
 {¶ 104} The trial court found that based on Officer Gonzalez' testimony, since she was bilingual, that Torres had a basic understanding of English. The trial *Page 29 
court also noted that the officers Mirandized him three times, twice in English and once in Spanish. After reviewing the record, we conclude that the trial court did not err when it denied Torres' motion to suppress statements. It is clear that Officer Feador was not interrogating Torres when he volunteered the statements. They had read him his rights in English and Spanish. He said that he understood them. Officer Feador did not initiate any questioning. They were not questioning him about the crime or even questioning him — at all. As such, Torres' second assignment of error is without merit.
 {¶ 105} In his third assignment of error, Torres argues that the jury verdict was against the manifest weight of the evidence. Essentially, Torres maintains that
 {¶ 106} without the eyewitness' testimony identifying him, there is no physical evidence
 {¶ 107} to link him to the crime.
 {¶ 108} In State v. Thompkins (1997), 78 Ohio St.3d 380, 387, the Supreme Court of Ohio stated:
 {¶ 109} "[a]lthough a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. [State v. Robinson (1955), 162 Ohio St. 486, 487]. Weight of the evidence concerns `the inclination of the greater amount of credibleevidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their *Page 30 
minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducingbelief.' (Emphasis added.) Black's, supra, at 1594.
 {¶ 110} "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony. [Tibbs v.Florida, 457 U.S. 31, 42]. See, also, State v. Martin (1983),20 Ohio App.3d 172, 175 * * * ('The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.')."
 {¶ 111} With this standard in mind, we conclude that Torres' conviction was not against the manifest weight of the evidence.
 {¶ 112} Appellant's counsel conceded at oral argument that if this court affirms the trial court's denial of Torres' motions to suppress the eyewitnesses' identification and his incriminating statements, then the verdict was not against the manifest weight of the evidence. We agree. If we had determined that the eyewitness identification should have been suppressed, then the evidence would have weighed heavily against his conviction. However, we upheld the trial court's *Page 31 
denial of Torres' motions to suppress. As such, the evidence is not against the manifest weight of the evidence.
 {¶ 113} Although Lett's in-court identification was questionable, there were two eyewitnesses who saw Torres get out of the van within a few feet to twelve feet away, accurately described him to the police, and then identified him within an hour of the shooting.
 {¶ 114} In addition to the eyewitnesses identifying Torres in the cold stand and in court, the state presented nineteen other witnesses. The testimony of Matilde, Obispo, and Neal established that Vorhees and Neal broke into a home on West 45th Street, stole a Play Station, some games, and CDs, got into a fight with four Hispanic males, walked home with the stolen items in a bag and Vorhees was shot a few minutes later. The testimony also showed that Torres had a gun and said that he "gave a shot at the girl."
 {¶ 115} Moreover, Officer Feador recorded a statement made by Torres that he was "robbed and he got one," before she knew anything about the events that occurred at the West 45th Street location. He also told Officer Feador that "maybe he took a bad name off the street."
 {¶ 116} Torres contends that because there was no physical evidence linking him to the crime; i.e., there was no gun residue found on his hands or clothes, no gun found, and no fingerprints or blood found in the van, that the state did not prove its case beyond a reasonable doubt. Torres further maintains that since the *Page 32 
only shell casings that were found were not from this shooting, Vorhees was killed by an anonymous drive-by shooter.
 {¶ 117} We disagree. After reviewing all of the evidence, weighing all reasonable inferences, considering the credibility of the witnesses in resolving conficts in the evidence, we cannot conclude that the jury lost its way and created such a manifest miscarriage of justice that the conviction must be reversed.
 {¶ 118} Torres' third assignment of error is also without merit.
 {¶ 119} Thus, Torres' three assignments of error are overruled. As such, the judgment of the Cuyahoga County Court of Common Pleas is affirmed.
It is ordered that appellee recover from appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
ANTHONY O. CALABRESE, JR., P.J., and MELODY J. STEWART, J., CONCUR.
[1] Officer Brinkhoff said that they saw a gray minivan parked in the parking lot of the market. They had received information earlier that a gray van may be involved in the shooting, but did not do anything with it at that time.
[2] Officer Feador's report actually said that the witness was Jason Meal. However, later testimony shows that his name is Jason Neal. For ease of understanding, we will simply refer to him as Jason Neal.
[3] The transcript is somewhat confusing at this point as to what he was saying to her in Spanish.
[4] "Poo" was later identified as Ford's neighbor, Clinton Simmons. "Poo's brother," Marvin Simmons, also a neighbor, testified at trial. "Rico" was later identified as David Lett, who testified at the suppression hearing, as well as at trial.
[5] Lett stated that he went to the police station on March 1, 2006. The prosecutor stated that at that time, they showed Lett a photo array, with Torres' photograph included. However, Lett testified that he did not remember being shown the photo array. The prosecutor explained that when they showed Lett the photo array, he did not identify anyone.
[6] Camarda was not asked this question at the suppression hearing.
[7] Matilde testified through a court translator. We note that his testimony is very confusing.
[8] At the suppression hearing, Lett first testified that he needed glasses to read. He then said that he can see "better up close" and needs glasses to see things in the distance.
[9] She did not verbally define "tree lawn," but she identified it in a photograph of the crime scene. It was the grass between the sidewalk and the street.
[10] The trial court granted Neal transactional immunity prior to his testifying.
[11] In his assignment, Torres claims that the trial court should have suppressed Ford's, Camarda's, and Lett's identification of him. However, he only argues that Ford's and Camarda's cold stand identification should have been suppressed. As such, we will only address the cold stand identification in our analysis, and not Lett's.
[12] Detective Matlock testified that Vorhees was twelve feet away from the shooter. Camarda was sitting beside Vorhees on the front porch. *Page 1